**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

IN RE:

| | | |
|---|---|---|
| BROCKWAY PRESSED METALS, INC., | : | Case No. 05-11891-TPA |
| Debtor, | : | Chapter 11 |
| | | |
| BROCKWAY PRESSED METALS, INC., | : | |
| LASALLE BANK NATIONAL | : | |
| ASSOCIATION, GENERAL MOTORS | : | |
| CORPORATION, BORGWARNER | : | |
| TORQTRANSFER SYSTEM, INC., | : | |
| AVM, INC., and DELPHI CORPORATION,: | | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Adversary No. 05-1303-TPA |
| | : | |
| EYNON ASSOCIATES, INC., | : | |
| Defendant | : | |

*Appearances:* Robert D. Nachman, Esq., Lead Counsel for LaSalle Bank National Association
Beverly Weiss Manne, Esq., for LaSalle Bank National Association
Ronald L. Hicks, Jr., Esq., for Eynon Associates, Inc.
Daniel A. Zazove, Esq., for the Debtor
Guy C. Fustine, Esq., for The Committee of Unsecured Creditors

## *MEMORANDUM OPINION*

This matter came before the Court for trial on the *Complaint to Determine Validity
and Priority of Liens* filed by the Debtor, Brockway Pressed Metals, Inc. ("Brockway") and LaSalle
Bank National Association ("LaSalle Bank") against Eynon Associates, Inc. ("Eynon"). The Court
considered the testimony, stipulations and other evidence submitted at trial as well as the arguments
of counsel. For the following reasons the Court enters Judgment in favor of Brockway and LaSalle

1

Bank, finding that Eynon's claim against funds currently held in escrow to be without merit. In light of LaSalle Bank's all inclusive security interest which includes Brockway's receivables, the escrow is payable to LaSalle Bank.[1]

### FACTS

On June 8, 2005, Brockway Pressed Metals, Inc., a Pennsylvania corporation, located in Brockway, Pennsylvania, filed for relief under Chapter 11 of the United States Bankruptcy Code and continued operating in debtor-in-possession status. Since 1953, Brockway was in the business of designing and manufacturing a wide range of highly engineered powder metal products. In the years prior to the petition date the most significant market opportunities for Brockway's powder metal part design and manufacturing expertise typically involved automotive applications including engine and transmission components, steering components, cruise control devices and various other applications for ultimate use in the automotive industry.

Because of the Debtor's highly engineered product line, it retained the Defendant, Eynon Associates, Inc., as its sale representative. Eynon, a Michigan corporation founded in 1936, is a product development and engineering sales representative for a select group of suppliers, who Eynon refers to as "principals," who manufacture various components, assemblies and materials that are uniquely engineered to meet the specific needs of the automotive industry. In marketing Brockway's product line Eynon works closely with engineers of existing and potential "customers"

---

[1]        The Court's jurisdiction under *28 U.S.C. §§157* and *1334* was not at issue. This is a core proceeding pursuant to *28 U.S.C. §§157(b)(2)(B), (F), (K)* and *(O)*.

2

such as General Motors Corporation, BorgWarner TorqTransfer Systems, Inc., AVM, Inc. and Delphi Corporation ("Designated Customers") to design and sell products that ultimately are to be manufactured by the suppliers/principals Eynon represents. Eynon represented Brockway since it first opened in 1953.

Beginning in 1953 and continuing until March 2, 1998, Eynon worked under an oral agreement with Brockway. Among other things, Brockway agreed to pay Eynon a commission "for the life of product" (continuing so long as the product was shipped, on average, being approximately 7 years) generally receiving 5% of the net invoice amount collected by Brockway on products sold and delivered to customers within the territory assigned to Eynon. Following Brockway's sale to Inland Steel, for the first time on March 2, 1998, Brockway and Eynon entered into a written Sales Representative Agreement (Ex. G) ("1998 Sales Representative Agreement") that, among other things, formally documented the Parties' then agreement as to the percentage of the net amount of receivables to be received by Eynon. Pursuant to the 1998 Sales Representative Agreement, Brockway appointed Eynon as its exclusive sale representative for all of Brockway's powdered metal products and assemblies sold to certain customers. According to its terms, Eynon was to promote and solicit orders of Brockway's products from customers within Eynon's then-assigned territory and to be paid pursuant to a set commission schedule including a formula for determining the date on which commission payments became due. The commission amounts were reduced from that which Eynon experienced under the oral sales representative agreement previously in place. The 1998 Sales Representative Agreement also included a "nonalienation" clause referring to Eynon as "Representative" and which stated:

> Nonalienation. The Representative's interests under this Agreement are not subject to the claims of the Representative's creditors and may not otherwise be voluntarily or involuntarily assigned, alienated or encumbered.

> *See* Ex. G, p. 8, Section XIV, ¶1, *Sales Representative Agreement*, dated March 2, 1998.

The 1998 Sales Representative Agreement remained in place until June 5, 2001 when Brockway and Eynon entered into another written contract, again entitled "Sales Representative Agreement" (Ex. H) ("2001 Sales Representative Agreement"). Similar to and expanding upon the prior agreement, the 2001 Sales Representative Agreement appointed Eynon as Brockway's exclusive sale representative for all Brockway's products sold to all existing or potential customers developed by Eynon within Eynon's then-assigned territory, setting forth similar duties and responsibilities for Brockway. As with the prior agreement, the 2001 Sales Representative Agreement contained a defined commission schedule but extended the actual date for payment of the commissions. As in the 1998 Sales Representative Agreement, it included identical "nonalienation" language. *See* Ex. H, Section XII, ¶ 2.

Under the prior agreement, the "life-of-the-product" commission had been reduced to a 3 year "posttermination term" (i.e., following termination of the contract) rather than "life-of-the-product." The new agreement extended the "posttermination term" commission to five years. The June 5, 2001 Sales Representative Agreement also provided that any disputes arising out of it were to be governed and construed in accordance with the applicable Pennsylvania law.[2]

---

[2]    By agreement of the Parties, all matters were to be governed by Pennsylvania law. *See* Ex. I, *First Amendment to Sales Representative Agreement*; Ex. H, *Sales Representative Agreement,* ¶XII.7. The prior agreement applied Michigan Law as the Parties' choice of law.

Although over time, Eynon's sales responsibilities continued to expand through 2004, Eynon was not Brockway's only sales representative. In August of 2004, Brockway and Eynon entered a new agreement entitled "First Amendment to Sales Representative Agreement" (Ex. I) ("2004 Amendment") under which Eynon became Brockway's only sales representative. The 2004 Amendment also modified the manner, amount and timing of payments from Brockway to Eynon related to earned sales commissions. Unless otherwise changed by the 2004 Amendment, the terms of the 2001 Sales Representative Agreement were incorporated into the 2004 Amendment which fully controlled the relationship of the Parties. No changes were made to the nonalienation clause.

LaSalle Bank first became involved in Brockway's operations in 1998 when it loaned money to Brockway's parent company, EMC Group, Inc., which loan was guaranteed by Brockway and certain other affiliated entities. In November of 2002, the Credit Agreement with LaSalle Bank and Brockway changed to include Brockway, among others, as borrowers instead of guarantors. As security for the obligation to LaSalle Bank, Brockway, as well as others, provided LaSalle Bank a security interest lien and mortgage in all or substantially all of Brockway's property. At no time during the financial relationship between Brockway and LaSalle Bank was Eynon a party to any documentation or even asked to execute any documents related to this obligation.

Through June of 2004, consistent with its contractual duties during both the oral and written contract periods, Brockway complied with its responsibilities for invoicing, collection of customer receivables and providing Eynon with a regular summary of all order acknowledgments and invoices. All decisions relating to pricing, specifications, acceptance of orders, shipment or delivery of products, return of products, credit and allowances or adjustment in accounts were made

5

solely by Brockway.  Brockway also forwarded to Eynon all commission amounts due for product

sales in regard to orders received and fulfilled through the sale of its products to its customers.  This

payment practice ended as of July of 2004 when no further commission payments were received by

Eynon up to and including the filing of the bankruptcy.  Despite Eynon's repeated demands,

Brockway failed to forward to Eynon the earned sale commissions due it pursuant to the 2004

Amendment.

In March, 2005, Eynon filed suit against Brockway in the United States District Court

for the Western District of Pennsylvania claiming, among other things, breach of contract, unjust

enrichment and conversion coupled with a demand for an equitable accounting due to Brockway's

continued failure to pay the earned sale commissions Eynon claimed as rightfully due it.  On August

6, 2005, Eynon entered default judgment against Brockway in the amount of $391,094.27

representing the earned sales commission Eynon believed was due and owing through February,

2005.  The default judgment allowed for the payment of postjudgment interest, costs and accruing

postjudgment commissions.  Following entry of the judgment, Eynon instituted garnishment

proceedings against a number of Brockway's customers.  Thereafter, on June 8, 2005, Brockway

filed the within bankruptcy.

### *PROCEDURAL HISTORY*

On June 13, 2005, the preliminary hearing on Brockway's first day motions took

place which included its request for an interim order for postpetition debtor-in-possession financing

("DIP Financing").  As expected, the proposed interim order required that all Brockway's

receivables be part of the DIP Financing collateral.  At that hearing, Eynon raised for the first time in the context of the bankruptcy proceedings, its claim that it was "more than" just a prepetition judgment and garnishment creditor.  Eynon claimed to hold a property interest in the receivables which was being ignored.  Eynon objected to any use of the receivables to secure the postpetition financing, claiming that under the 2004 Amendment the prepetition and postpetition receivables collected by the Debtor were held jointly for the benefit of both Brockway and Eynon (as Brockway's exclusive sales agent) with Eynon entitled to between 3% to 5% of the receivables depending on whether the receivable represented "existing business" or "new business," none of which could be alienated by Brockway or any other creditors in these proceedings.

In order to resolve Eynon's objection, the interim debtor-in-possession financing Order dated June 17, 2005 ("Interim DIP Order")[3] and the final debtor-in-possession financing Order dated July 21, 2005 ("Final DIP Order"),[4] both entered with Eynon's consent, contained language protecting Eynon's claim to the disputed sales commissions.  Two, separate escrows were created: the "Post-petition Accounts Payable Escrow" and the "Garnishment Escrow."  The sole purpose of these escrows (collectively "Eynon Escrows") was to insure that if Eynon was ultimately successful in proving its claim of entitlement to the disputed sales commissions, sufficient funds would be available for immediate payment to Eynon so as to eliminate any difficulties that may be associated

---

[3]      *See Interim Order Authorizing Debtor-in-Possession to Obtain Postpetition Financing and Providing Adequate Protection and Granting Liens, Security Interests and Superpriority Claims*, dated June 17, 2005, Document No. 124.

[4]      *See Final Order Authorizing Debtor-in-Possession to Obtain Postpetition Financing and Providing Adequate Protection and Granting Liens, Security Interests and Superpriority Claims*, dated July 21, 2005, Document No. 216.

7

with Eynon's ability to collect the monies ultimately determined to be rightfully due it.[5]

On August 29, 2005, Eynon filed a *Motion for Relief from Automatic Stay* seeking turnover and possession of the Eynon Escrows. Eynon claimed that based on the applicable contract documents coupled with the conduct of the Parties in dealing with the contracts, the Eynon Escrows represented trust monies rightfully due Eynon, the designated beneficiary. As such, they could not be considered property of the estate pursuant to *11 U.S.C. §541(d).*[6] LaSalle Bank, the Official Committee of Unsecured Creditors and the Designated Customers each filed responses disputing Eynon's right to relief from stay asserting that the Sales Representative Agreements entered between Brockway and Eynon were simply that. No trust was created. Nor did Eynon's claim to the Brockway receivables rise any higher than any other unsecured creditor.

In September, 2005, and apparently in response to Eynon's motion for relief from stay, Brockway and LaSalle Bank jointly filed their original *Complaint to Determine Validity, Priority and Extent of Liens* against Eynon. In the *Complaint*, the Plaintiffs sought, among other things, a determination that the judgment entered by Eynon against Brockway within the 90 day period prior to the petition filing was an avoidable preference and that establishment of the Eynon Escrows in the DIP Financing Orders was simply a mechanism designed to protect Eynon's claim

---

[5]    The "Post-petition Accounts Payable Escrow" was created pursuant to the Interim DIP Order and the Final DIP Order directing the Designated Customers to set aside a fund in the amount of $45,000 which represented 50% of Eynon's estimated postpetition earned sales commission of $90,000 which would be due Eynon if successful on its alleged claim to postpetition receivables. The "Garnishment Escrow" was created pursuant to the Interim DIP Order and the Final DIP Order and calculated at 125% of Eynon's $391,094.27 prepetition judgment for a total of $491,293.63 of collected receivables placed in an interest bearing account in order to establish an escrow pending final adjudication of Eynon's rights in this particular matter. In addition to these monies, the Interim DIP Order and Final DIP Order required LaSalle to fund the balance of any amount in excess of that figure which ultimately might be awarded by the Court in the event Eynon was successful on its alleged claim.

[6]    Unless otherwise indicated, all references in this Opinion are to the United States Bankruptcy Code, Title 11, *11 U.S.C. §101, et seq.* as it existed prior to October 17, 2005, the effective date of the *Bankruptcy Abuse Prevention and Consumer Protection Act of 2005* (BAPCPA), P.L. 109-8, §256, 119 Stat. 23, *11 U.S.C. §101 et seq.*

to the receivables at the time of the DIP financing hearings.[7]   The Plaintiffs claimed no trust was created by these Orders nor had any trust previously been created for Eynon's benefit in the Brockway receivables by the various sales representative agreements.  As such, the Plaintiffs sought an order declaring Eynon's claim to the receivables both unsecured and subordinate to LaSalle Bank's all-encompassing security interest and lien on the receivables.

The Plaintiffs' original complaint was later amended to expand the group of Plaintiffs to not only include Brockway and LaSalle Bank but to also include the Designated Customers, i.e., General Motors Corporation, BorgWarner TorqTransfer Systems, Inc., AVM, Inc. and Delphi Corporation.  This six count *Amended Complaint* incorporated the Debtor's prior claims that Eynon's prepetition judgment was an avoidable preference and that no portion of the prepetition receivables collected were trust funds belonging to Eynon.  LaSalle Bank claimed its all-inclusive security interest took priority over both Eynon's prepetition unsecured claims.  For similar reasons, the Designated Customers objected to Eynon's claim to any postpetition accounts payable, specifically disputing the existence of any trust for Eynon's benefit as a result of Eynon's prior agreements with Brockway or the Final DIP Order.  The Designated Customers claimed these funds rightfully belonged to them since they funded the Debtor's postpetition operations and obtained superpriority lien status on their loan as a result of the DIP Financing Orders.

In its *Answer* to the *Amended Complaint*, Eynon first claimed that the clear language of the various contract documents created an express trust naming Eynon as the beneficiary.  Eynon

---

[7]      *See Interim Order,* Document No. 124, ¶¶12, 17; *Final Order*, Document No. 216, ¶¶12, 17; *Cash Collateral Order*, Document No. 290, ¶12(B).

believed that once Brockway accepted each customer order, upon the receipt of the specific receivable, the earned sales commission associated with each sale was held by Brockway in trust as a fiduciary for Eynon, Brockway's sole sales representative. Therefore, Eynon reasoned, the respective earned sales commissions represented property rightfully belonging to it and not property of the estate.

Eynon's *Answer* also asserted a *Counterclaim* against all of the Plaintiffs, again claiming entitlement to all of its unpaid earned sales commissions generated by Brockway products sold and delivered prior to and following the filing of the bankruptcy. Eynon's claim of entitlement was based on the alleged existence of an express trust, a constructive trust and/or a resulting trust created in its favor by the applicable written documents, coupled with the conduct of Brockway, which taken as a whole, clearly created a trust relationship. Brockway, as trustee, allegedly held the earned sales commissions for the benefit of Eynon. Alternatively, Eynon claimed that a confidential relationship existed between it and Brockway requiring payment to Eynon of all the monies due it so as to prevent unjust enrichment. Eynon also claimed entitlement to 100% of the funds represented by the Eynon Escrows created by the DIP Financing Orders[8] and held pending resolution of its claim.

With the filing of the *Amended Complaint*, Eynon agreed to allow its motion for relief from stay to track the pending adversary for purposes of trial and decision. Prior to trial on the within adversary, Eynon also agreed that any liens arising from Eynon's prepetition judgment and

---

[8]        Eynon also claimed entitlement to the Eynon Escrows as a result of the *Order* dated August 5, 2005 identified at Exhibit 18 and originally filed on August 8, 2005 at Document No. 288 following a hearing on LaSalle Bank's request to extend the Cash Collateral Order. The Order entered simply maintained the status quo previously created by the DIP Financing Orders and created no new substantive rights in favor of Eynon or modified any existing rights of the Parties.

garnishment actions were in fact avoidable preferences and, unless the Court found the existence

of a trust, the balance of Eynon's claim was to simply be treated as a general, unsecured claim.

Furthermore, the claim and counterclaim involving the Designated Customers were resolved and

withdrawn for purposes of trial.[9]  Eynon also withdrew its claim based on a resulting trust theory.

As a result of the various pretrial stipulations, the only remaining issue before the

Court for purposes of trial was whether an express trust or a constructive trust existed.  If so, Eynon

would be entitled to the funds represented by the Eynon Escrows unless the Court agreed with

LaSalle Bank's position that any award was limited to a percentage of the trust res collected

postpetition,[10] and in the event a constructive trust was found to exist, LaSalle Bank's lien would

take priority.  If no trust existed, express or constructive, Brockway would be entitled to the Eynon

Escrows subject to LaSalle Bank's secured lien.[11]

## *DISCUSSION*

In advancing its claim that a trust exists, Eynon argues that because Eynon served

as Brockway's sales representative from 1953 to 2004, without incident, a "familial-like"

---

[9]     As a result of this event, the Eynon Escrows" only include the funds set aside in the "Garnishment Escrow" in the face amount of $491,293.26 and LaSalle Bank's promise to fund any deficiency that may occur if Eynon is successful in its claim.

[10]     Eynon's claim in this regard would therefore be limited to $52,748.51.  The amount of the receivables collected totaled: $1,758,283.72, that is, $491,293.62 and $1,266,990.10 per ¶¶ 64 and 70, respectively, of the *Stipulations of Fact and Evidence for Purposes of Trial*, Document No. 63; *Trial Transcript*, May 30, 2006, p. 9-10, l. 18-11.  For purposes of this proceeding, although Eynon is contractually entitled to a 3% commission on net receivables for "Existing Business" and 5% for "New Business," Eynon's claims are calculated using only 3%.  *See Pretrial Memorandum of Law of Defendant Eynon Associates, Inc.*, filed February 3, 2006, Document No. 41, p.8.

[11]     *See Trial Transcript*, May 30, 2006, Document No. 65, pp. 7-10, l. 19-16.  As a further result of these pretrial stipulations, at the time of trial the Debtor chose not to formally appear by way of counsel.  Since the only real remaining issue to be tried involved LaSalle Bank, there was no practical reason for Debtor's counsel to appear and incur the additional cost and expense.  As such, the Court allowed the trial on Count II, which involved essentially the same issue as Count V in which LaSalle Bank was the Plaintiff, to continue without the presence of Brockway's Counsel. *Id.*

relationship akin to that of "a marriage" arose involving "trust" and reliance on Brockway due to the very nature of the business between the two which often required Eynon to wait several years before it received payment, beginning from the time it began its sales efforts until a sale was finally consummated.    Since throughout that time Eynon substantially relied on Brockway to hold receivables in "trust" for it, a confidential relationship existed giving rise to an express trust, or alternatively, a constructive trust.    Eynon contends this "trust" relationship was further demonstrated since, over time and culminating with the 2004 Amendment, Eynon became Brockway's exclusive sales representative for all of its products.    Eynon also claims in support of its trust theories that throughout the duration of this relationship it received assurances from Brockway that "it would be treated in a special manner, separate and apart from other parties, and would have priority over other creditors."[12]    Based upon consideration of all the evidence, although the Court agrees that as principal and agent, a relationship may have existed between Brockway and Eynon giving rise to a fiduciary obligation in Brockway to account to Eynon regarding the extent and amount of earned sales commission owed to it, Eynon has failed in sustaining its admittedly heavy burden of demonstrating the existence of either an express trust or constructive trust.

In determining the existence of a trust relationship and whether property rights exist in a party, bankruptcy courts generally first look to applicable state law which here, is Pennsylvania law.  *City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95 (3d Cir. 1994); *Goldberg v. New Jersey Lawyers' Fund*, 932 F.2d 273, 280 (3d Cir. 1991); *In re Kamand Construction, Inc.*, 298 B.R. 251, 255 (Bankr. M.D. Pa. 2003).  For bankruptcy purposes, both Pennsylvania and federal law recognize

---

[12]    *See Pretrial Memorandum of Law of Defendant Eynon Associates, Inc.,* filed February 3, 2006, Document No. 41, p.17.

the three primary types of trusts which may arise when considering whether property held by a

debtor is or is not property of the estate, that is, an express trust, a constructive trust or a resulting

trust. *Buchanan v. Brentwood Federal Savings and Loan Ass'n, et al.*, 320 A.2d 117, 122-123 (Pa.

1974); *Gray v. Liebert*, 53 A.2d 132, 135-36 (Pa. 1947); *In re Kulzer Roofing, Inc.,* 139 B.R. 132,

139-40 (Bankr. E.D. Pa. 1992).[13]

      Once a trust is determined to exist under state law, in a bankruptcy proceeding the

effect of that finding is governed by federal law. A trustee has no equitable interest in funds it holds

in trust. *In re Columbia Gas Systems, Inc.*, 997 F.2d 1039, 1059 (3d Cir. 1993); *City of Farrell*, 41

F.3d at 95 (quoting *Begier v. IRS*, 496 U.S. 53, 59 (1990)). "Indeed, that is the classic definition of

a trust - the beneficiary has an equitable interest in the trust property while legal title is vested in the

trustee." *In re Columbia Gas Systems*, 997 F.2d at 1059 (citing Restatement (Second) of Trusts §2

cmt. f (1959). As such, it is well-settled that "debtors do 'not own an equitable interest in property

... [they] hold [] in trust for another,' and that therefore funds held in trust are not 'property of the

estate.'" *City of Farrell*, 41 F.3d at 95 (quoting *Begier v. IRS,* 496 U.S. 53, 59 (1990)).

*Express Trust*

      The following elements must be present for an express trust to exist under

Pennsylvania law: (1) an express intention to create a trust; (2) an ascertainable res; (3) a sufficiently

certain beneficiary; and (4) a trustee who "owns" and administers the res for the benefit of the

---

[13]     Also prior to trial, Eynon withdrew any claim on the net collected receivables, which were the subject of a resulting trust. *See Pretrial Memorandum of Law of Defendant Eynon Associates, Inc.*, filed February 3, 2006, Document No. 41, p.15, n. 2.

beneficiary. *In re Vosburgh's Estate*, 124 A. 813, 815 (Pa. 1924); *In re Milton Hershey* School, 867

A.2d 674, 682 (Pa. Commw. Ct. 2005); *In re Penn Central Transportation Co.*, 486 F.2d 519, 524

(3d Cir. 1973), *cert. denied sub nom., Baker v. Indiana Harbor Belt Railroad*, 415 U.S. 990 (1974);

*In re I.D. Craig Service Corp.* 125 B.R. at 456 (under Pennsylvania law, to create an express trust,

there must be a res, an express intent to create a trust, an identifiable beneficiary, and, a trustee with

enforceable duties to administer the trust for the benefit of another); *In re Haney*, 316 B.R. 817

(Bankr. E.D. Pa. 2004); *In re Verrone*, 277 B.R. 66 (Bankr. W.D. Pa. 2002).

Since relevant state law governs the existence of an express trust, as a rule, the

burden of proving the existence of an express trust is on the party asserting its existence. *In re

Borbidge*, 90 B.R. 728, 734 (Bankr. E.D. Pa. 1988)*; 76 Am. Jur. 2d Trust,* §628 (2006). Here the

Parties agree that, as the proponent, it is Eynon's burden to prove each of the elements in

establishing the existence of an express trust. *In re Verrone*, 277 B.R. 66, 72 (Bankr. W.D. Pa.

2002); *In re Hartman*, 254 B.R. 669, 673 n. 3 (Bankr. E.D. Pa. 2000) (citations omitted); *In re

Manzo*, 106 B.R. 69, 71 (Bankr. E.D. Pa. 1989). Eynon also acknowledges that while no particular

form of words or conduct is necessary for the creation of an express trust, the language or conduct

offered to show the manifestation of an intent to create the same must be proven by evidence which

is clear, precise and unambiguous. *Keller v. Keller*, 41 A.2d 547, 549 (Pa. 1945); *In re Manzo*, 106

B.R. at 71 (Bankr. E.D. Pa. 1989); *In re Borbidge*, 90 B.R. at 734.

Here, the obvious starting point for determining the existence of an express trust is

the 2004 Amendment which documented the most recent relationship between Eynon and Brockway

under the terms of which Brockway was in default regarding payment of Eynon's accrued, unpaid

14

sales commissions.  Based on a review of that document, which incorporated the 2001 Sales

Representative Agreement unless otherwise specifically changed, it is clear to the Court and beyond

dispute by Eynon, that the written document does not, in and of itself, create an express trust in favor

of Eynon.  Other than the possible effect of the nonalienation clause which will be discussed below,

on its face the 2004 Amendment does not specifically identify a trust.  It does not specify a

beneficiary or set forth any language arguably able to support the existence of a trust for the benefit

of Eynon, the putative beneficiary.  Neither a trustee nor a res to be administered by a trustee is

expressly identified.  No duties are specified for Brockway to perform as the putative trustee on

behalf of Eynon.  Brockway is not limited in any way as to its use of the receivables.   There is no

requirement to segregate the monies it receives related to the Eynon sales.  Basically all Brockway

is required to do is invoice customers, collect receivables and pay Eynon its specified commissions

within two and one-half months regardless of when Brockway was ultimately paid.  In a vacuum,

without the benefit of parol or course of dealing evidence, clearly the 2004 Amendment is simply

an independent contractor agreement creating an agency relationship between Brockway and Eynon.

For all these reasons the Court finds Eynon has failed in sustaining its burden in demonstrating that

the 2004 Amendment, standing alone, creates an express trust benefitting Eynon.  However, our

inquiry does not end here for purposes of determining the existence of an express trust.

         As previously indicated, applicable state law is to be applied in determining whether

a trust exists thereby creating a separate property right.  Coincidentally, Pennsylvania law and

federal law agree that in the absence of express language creating a trust the intent to create an

express trust may be manifested by the conduct and words of the parties and not simply by written

contract. *Buchanan v. Brentwood Federal Savings and Loa*n *Ass'n., et al.*, 320 A.2d 117, 122-123 (Pa. 1974); *In re Gray and Liebert*, 53 A.2d 132, 135 (1947); *In re Scheidmantel*, 868 A.2d 464, 488 (Pa. Super. Ct. 2005); *In re Vosburgh's Estate*, 124 A. 813, 815 (Pa. 1924);  *In re Columbia Gas Systems,* 997 F.2d at 1060.  Furthermore, in creating a trust relationship the parties need not use any "talismanic language" or employ any particular form of words to support the existence of a trust. *In re Gray* , 53 A.2d at 134; *In re Columbia Gas Systems*, 997 F.2d at 1060.  Consistent with that notion, neither the presence nor absence of the words "trustee" or "beneficiary" is determinative of the parties' intention to create a trust.  *Buchanan v. Brentwood Federal Savings & Loan Ass'n*, 320 A.2d at 144-145.  In other words, failure to expressly designate the relationship either verbally or in writing as one of trust does not necessarily negate its existence.  *In re Gray*, 53 A.2d at 135; *In re Columbia Gas Systems*, 997 F.2d at 1060;  *In re Penn Central*, 486 F.2d at 524; *see also Eckell v. Borbidge*, 114 B.R. 63, 67 (E.D. Pa. 1990).  In an attempt to demonstrate the existence of a trust relationship between Eynon and Brockway and to support a finding that it held equitable title to the unpaid earned sales commissions, Eynon called upon its president and sole shareholder, Sandy Eynon.

At trial, Sandy Eynon described the close working relationship Eynon creates with each of its "principals," including Brockway, which involves long-term product research and development duties while simultaneously assessing customer needs in developing a product, all of which gives Eynon an advantage in the marketplace when soliciting orders and at the time of order placement.  But the focal point of Sandy Eynon's testimony was to support and identify the extent of Eynon's alleged confidential relationship between it and Brockway forming the basis for its claim of a legally enforceable trust in regards to the unpaid earned sales commissions.  In doing so, Sandy

16

Eynon explained the long-term, independent sales representative relationship which existed between Eynon and Brockway.

From 1953 to 1998 Eynon was a primary sales representative for Brockway based simply on an oral contract between the two without any written or supporting documentation. Sandy Eynon and his family were personal friends of the shareholders of Brockway. In fact, Brockway was started in 1953 by a former employee of Sandy Eynon's grandfather. Sandy Eynon and his father, a previous owner of Eynon, even held stock in Brockway. Sandy Eynon described Eynon's relationship with Brockway as akin to "a marriage." The entire time prior to 1998, Brockway was responsible for collecting and obtaining receivables and providing Eynon with the relevant payment documentation. During that entire time, Brockway faithfully and timely paid all of the sales commission due Eynon.

Sandy Eynon admitted that in 1998 when Inland Steel took over Brockway's operation the "marriage" between Eynon and Brockway began to take a somewhat different form. He ceased holding shares in Brockway. Inland Steel required that the sales representative relationship between the two be documented in written form giving rise to the 1998 Sales Representative Agreement. The 1998 Agreement reduced Eynon's commission payment from the "life of the part" commission term to a 3 year "posttermination" term commission unlike any payment relationship Eynon had with any of its other "principals." Eynon's general sales commission was reduced from 5% (affecting about 90% of Eynon's business) to a flat 3%. Brockway's sales force was reduced somewhat apparently in return for the commission adjustments and the nonalienation language was recommended and inserted in the agreement by Inland Steel.

17

Although Sandy Eynon could not remember the exact circumstances for its inclusion, he did recall that it was included "to protect my interests so that my receivables couldn't be attached or taken away or encumbered in any way" by a third party. *Trial Transcript*, May 30, 2006, Document No. 65, p. 51, l. 11-24.

Sandy Eynon also admitted that he expressed "some disappointment" with the 1998 Sales Representative Agreement and sought a change which gave rise to the 2001 Sales Representative Agreement. Inland Steel was no longer involved in the operations of the Debtor and Eynon was working with new owners. The 2001 Sales Representative Agreement was essentially the same as both the prior oral and written agreements except that as a result Eynon became the sole independent representative and responsible for 100% of the automotive accounts receiving a 5 year "posttermination" commission. The 2001 contract contained the identical nonalienation clause as was contained in the 1998 contract.

For the first time, in June, 2004, Brockway failed to pay Eynon its monthly sales commission. According to Sandy Eynon, at approximately that time the new management at Brockway approached him for a commission reduction. In August, 2004, the First Amendment to the 2001 Sales Representative Agreement was entered. As with all prior Sales Representative Agreements, Brockway remained responsible for maintaining all documentation concerning sales and collection of receivables. The sales commission to be paid Eynon was reduced to reflect the price pressures in effect in the auto industry. In return for reducing the commission due it for previously booked business, "new business" Eynon generated was increased to 5% on a declining schedule. The time for making payment to Eynon was also extended by 15 days. Sandy Eynon

18

testified that it was he who inserted language requiring that the agreed upon 2.5% commission be increased to 3% if not paid within the 15 day period as an "incentive" so as to "correct the delinquency of their accounts."  Payment was to be made on time whether or not Brockway was paid. *Trial Transcript*, May 30, 2006, Document No. 65, p. 61, l. 1-23.  The nonalienation clause was not addressed and remained unaffected by the 2004 Amendment.

Eynon believes the holding in *Williams v. Finlaw, Mueller & Co.*, 141 A 47 (Pa. 1928) is critical to the Court's determination in this case mandating a finding for the existence of an express trust in Eynon's favor.  Throughout these proceedings Eynon has argued that as a result of the Pennsylvania Supreme Court's decision in *Williams,* this Court must find as a matter of law that either an express trust exists, that the relationship of the Parties manifested an intent to create an express trust, or at the very least, a confidential relationship existed between Eynon and Brockway giving rise to an express trust.

The *Williams* case involved an almost identical fact situation as the one before us. In *Williams*, the Pennsylvania Supreme Court directed that an accounting be rendered to the plaintiff agent, a commission sales manager, who requested but was denied information from the defendant, his corporate principal, who engaged him by oral contract to sell bonds in a certain territory.  The agent instituted an action in equity against the corporate principal seeking sales information of which the agent believed no accounting had ever been made.  The plaintiff agent claimed no means of ascertaining the names of the persons who bought the bonds or the net amount of the respective sales since his access to the books of the corporate principal had been denied.  Unlike this case, also surrounding the request in *Williams* for an accounting were allegations that the corporate principal

19

previously made "false and fraudulent statements" with the intent to "cheat and defraud" the plaintiff

agent.   The plaintiff agent alleged the existence of a "fiduciary relation" between he and his

corporate principal entitling him to an accounting.   The central issue before the court was its

jurisdiction to entertain such a request on the equity side of the court.   While recognizing the general

rule that a mere principal/agent relationship is insufficient to warrant a decree for an accounting,

under the specific facts of the case, the court found that the principal and agent relationship took on

the attributes of a "fiduciary" character and therefore an accounting was appropriate.   *Williams*

141A. at 49.

Eynon attaches great significance to the passage in *Williams* whereby the court also

recognized that although in the typical case brought by an agent against his principal there is no duty

to account since as a general rule no trust or confidence is reposed in the principal, "where the

effective working of the agency contract and the conduct of the parties necessarily imposes a trust

relation on the principal, who is in receipt of a sum of money coming from numerous sources, as in

a case where the agent's salary depends upon the profits, equity will order an accounting."  *Id.* at

49.  Eynon believes this finding stands for the proposition that an express trust is created when facts

exist similar to the *Williams* case.  This Court does not assign such weight to the *Williams* holding

nor has our research or the research of the Parties revealed any other case so interpreting the holding.

The use of the term "trust" in the context of the *Williams* case was not intended to

create a property right or vehicle by which Eynon could obtain an equitable interest in the

receivables collected by Brockway to insure payment of the commission payment it had contracted

for with Brockway.   Rather, "trust" was used in the moral sense, that is, the agent reposed a

modicum of confidence in the principal to perform certain obligations prior to rendering payment and provide the agent information uniquely within the principal's access and control. To accord the *Williams* decision the weight Eynon proposes would immediately elevate every debtor relationship involving an unpaid obligation to compensate a commission sales agent to express trust status. This is clearly not the intended result from a fair reading of *Williams* and inconsistent with the system of claim priority intended by *11 U.S.C. §507(a)(3)*.

Clearly the *Williams* court did not recognize or create a separate, legally enforceable trust entity by its decision. It merely recognized that in situations involving the reliance on the integrity, strength and ability of a party with the sole charge, custody or care of certain information and upon which the agent's compensation is determined, as is present in this case, the principal has a duty to account to the agent. The *Williams* court had the opportunity to recognize the existence of a separate legal trust relationship when it opted to simply require an accounting but specifically chose not to do so by drawing a distinction between a fiduciary obligation possibly arising in a principal/agent situation as opposed to its existence in the more traditional settings, noting that "a well-recognized fiduciary relation exists, as in the case of trusts or partnerships, ..." *Id.* at 49. As such, all the *Williams* court decided was that a "fiduciary relationship" existed under the specific facts of the case where, by the very nature of the relationship, the principal owed the agent a duty of good faith, trust, confidence and candor in accounting for the sales commission due the agent. In such an instance, an accounting would be required when the agent requested one; nothing more, nothing less. Simply because a fiduciary relationship may exist does not, in and of itself, create an

express trust relationship as a matter of law.[14]  For similar reasons this Court does not read *Williams* to stand for the proposition that the mere existence of a fiduciary relationship requires, under the facts of this case, a finding that the Parties manifested an intent to create an express trust.

Since application of *Williams*, alone, does not provide a basis for finding the necessary manifestation of intent to create an express trust under Pennsylvania law, the Court is required to review the balance of the available evidence in search of this important element.   As previously noted, the existence of a trust can be inferred by the words and conduct of the parties. Eynon argues that the testimony of Sandy Eynon clearly demonstrates that Brockway and Eynon intended the creation of an express trust in this regard.  A further review of his testimony reveals that such an intent is not so clear.

During his trial testimony, Sandy Eynon often used the word "trust" to describe Eynon's relationship with Brockway but never in a form helpful to Eynon's claim that the Parties intended the existence of an express, legally enforceable trust composed of the earned, but unpaid, commissions due Eynon.   There was no requirement that Brockway maintain or establish a separate bank account for purposes of depositing the net collected receivables.  *Stipulations of Fact and Evidence for Purposes of Trial*, Document No. 63.  Sandy Eynon understood and acknowledged that

---

[14]        There are many circumstances where the mere existence  of a fiduciary relationship does not create a separately recognized legal entity such as an express trust.  The debtor-in-possession stands in a fiduciary relationship to creditors of the estate (as does the trustee for the debtor out of possession) and is duty-bound to exercise the measure of care, diligence and skill that an ordinarily prudent person would exercise under similar circumstances while involved in estate matters.  *See 7 Collier on Bankruptcy*, ¶1107.02 [4], p. 1107-13 (Lawrence P. King ed. 2006).  Likewise, members of a bankruptcy committee have a fiduciary duty to the class of creditors the committee represents.  *See 7 Collier on Bankruptcy*, ¶1103.05 [2], p. 1103-29 (Lawrence P. King ed., 2006). The trustee in reorganization cases, as a fiduciary, is obligated to treat all parties in the case fairly and owes the debtor's estate and its creditors a general duty of loyalty.  *See 7 Collier on Bankruptcy*, ¶1106.02 [3], p. 1106-10 (Lawrence P. King ed., 2006); *W.D. Realty, Inc. v. Northern Insurance Company of New York*, 334 F.3d 306, 314 n. 6 (3d Cir. 2003) (citing *Black's Law Dictionary* 625 (6th ed. 1990) (a fiduciary relationship arises when, among other things, a person having duties involving good faith, trust, special confidence and candor toward another arises); *see also Meier v. Maleski*, 648 A.2d 595, 607 n. 23 (Pa. Commw. Ct. 1994) (citing *Black's Law Dictionary* 564 (5th ed. 1979).

at no time did Brockway segregate the net receivables it received. He also admitted that he did not object to Brockway's deposit of the monies into its general fund so long as Eynon was paid at the time its commission check was due. *Trial Transcript*, May 30, 2006, Document No. 65, pp. 80-81, l. 7-24. Sandy Eynon testified that so long as Eynon was timely paid Brockway could do whatever it wanted with the receivables it collected. *Trial Transcript*, May 30, 2006, Document No. 65, p. 87, l. 9-16. When asked on cross examination about the concept of trust in a legal context, he readily admitted that the idea of an express trust as is now being alleged was never mentioned in any of the contract negotiations. *Trial Transcript*, May 30, 2006, Document No. 65, p. 76, l.7-22. There was no mention in his testimony surrounding the details of the 2004 Amendment, or the prior agreements for that matter, of Brockway's intent that Eynon be treated in any special manner separate and apart from other parties and with priority over other creditors. Actually, Sandy Eynon's testimony was devoid of any mention of an intent by the Parties to create an express, legally enforceable trust at any time during the over 50 year relationship of the two. Taken as a whole and in context, the very nature of the long-term relationship between the Parties as described by Sandy Eynon was actually indicative of a lack of intent to create an express trust in order to protect payment to Eynon of its unpaid commissions. Nonpayment was never an issue until July, 2004, when, for the first time, Eynon failed to receive its monthly commission check.

In 1998, when Inland Steel acquired Brockway, Sandy Eynon received an early indication that the long-term "familial" relation between Eynon and Brockway was unraveling. For the first time Brockway required a written sales representative agreement. Sandy Eynon and his family no longer were shareholders of Brockway. Although most of the written terms tracked the

prior, oral agreement, new compensation terms were included.  Most importantly, unlike its other

"principal" relationships, Eynon was required to accept a change in its lucrative "life-of-the-

product" commission reducing it to a three year, post-termination commission term.  Unhappy with

this new arrangement Sandy Eynon negotiated with yet another, new Brockway owner an extension

in the post-termination commission term culminating with the 2001 Sales Representative

Agreement.  Then, on the eve of entering the 2004 Amendment, the "marriage" between Brockway

and Eynon effectively fell apart when, for the first time, Brockway failed to make Eynon's expected

monthly commission payment.  *Trial Transcript*, May 30, 2006, Document No. 65, p. 77, l. 19-25.

It was under this setting in August, 2004 that Brockway and Eynon renegotiated the

2001 Sales Representative Agreement resulting in the 2004 Amendment.  Despite this background

which presented Eynon ample opportunity to clarify any ambiguous details of the alleged terms of

the express trust supposedly existing in its favor, Sandy Eynon chose not to do so even though

represented by counsel.  Rather than include additional language so as to enhance or clarify the

alleged trust situation, Eynon opted instead to address its sales and territory exclusivity and increase

the post-termination commission term.  When asked on cross-examination as to his reasons for not

addressing the trust situation Sandy Eynon admitted it was a "difficult thing to do" since tantamount

to accusing Brockway of "not being honorable people." *Trial Transcript*, May 30, 2006, Document

No. 65, p. 78, l. 1-17.  These words and actions are not consistent with an individual who actually

believed his company was the beneficiary of a legally enforceable trust and was not being paid

despite existence of the same.  Rather, upon review of the Eynon testimony and the reasonable

inferences to be drawn therefrom, the Court finds that no intent existed between Brockway and

Eynon to create or maintain a legally enforceable trust relationship.

24

Sandy Eynon's description of the trust issues as an "intangible" further explained his true understanding of the relationship between Brockway and Eynon. Dating back to the time of the original "hand shake" deal, the business connection between Eynon and Brockway lacked any physical existence or structure but was grounded on a sense of confidence and trust flowing between the two. This was the familial relationship "akin to a marriage" that Sandy Eynon described in his testimony. However, with the advent of the 1998 and 2001 Sales Representative Agreements, the failure of Brockway for the first time to make a commission payment in July of 2004, and, entry into the 2004 Amendment under these circumstances without even approaching the issue of a legally enforceable, express trust, the more plausible explanation of the Parties' relationship as of that time was simply that they were involved in an independent sales representative agreement, a principal/agent relationship, creating an obligation for Brockway to pay Eynon for its future services on a commission basis.

Not only do the inferences from his testimony suggest that a trust relationship was never intended between the parties, in essence, Sandy Eynon ultimately admitted as much when during his testimony he referred to the "trust issues"as "intangibles." *Trial Transcript*, May 30, 2006 at Document No. 65, p. 38, l. 7-9 It is clear to the Court that throughout his testimony Sandy Eynon used the term "trust" in the context of the moral concept of "trust," as a virtue, obviously very different from use of the word in the context of an express, legally enforceable trust. *Trial Transcript*, May 30, 2006, Document No. 65, p.37-29, l. 24- 6; p. 9, l. 11-14. At no time during his testimony did Sandy Eynon testify or specifically identify any words or actions directly supporting the existence of an express, legally enforceable trust.

25

Eynon correctly points out that the hallmark of a debtor/creditor relationship is the payment of interest when one party allows another to use its money for a period of time. *In re Columbia Gas Systems*, 997 F.2d at 1060. Eynon claims that since Paragraph 4 of the 2004 Amendment does not specify the payment of any interest, the absence of any interest component "... counsel[s] in favor of finding a trust." *Id.* at 1060. Paragraph 4 of the 2004 Amendment, which specifically amends Section V of the 2001 Sales Representative Agreement, states the following:

> (2) Each commission payment shall be paid no later than the 15th day of the third month following the month in which delivery was made. In the event Company fails to pay any commission due Representative on or before the fifteenth (15th) day of the third month following the month in which delivery was made, then the commission rate shall revert to and be three (3%) percent on all net amounts collected on invoices being paid at two and one-half (2.5%) percent commission rate until the Company corrects the late payment and all commissions due Representative are received within said payment period.
>
> Ex. I, ¶4, Section V(2), *First Amendment to Sales Representative Agreement*, dated August 12, 2004.

The Court believes that in the context in which the above payment terms were inserted in the 2004 Amendment, the better interpretation is that it is language of debt and not the language of trust. In his testimony Sandy Eynon admitted he was responsible for inserting this language as "an incentive" for Brockway "to get back on a current pay basis" and as a "penalty" for its failure to do so. *Trial Transcript*, May 30, 2006, Document No. 65, p. 61, l. 16-23; p. 78, l. 10-12. As such, the original 2.5% commission Eynon earned was actually subject to an interest component in the form of an incentive and penalties for Brockway's failure to timely remit any commission payment due, which requirement was inserted in the 2004 Amendment at Eynon's instance. Thus,

26

Brockway's use of the receivables and the debt owed Eynon was not unfettered and without cost to

Brockway.  Such undisputed facts "counsel" against the existence of a trust.

In attempting to otherwise glean the intent of the Parties from the 2004 Amendment,

Eynon also directs the Court to the nonalienation clause.  The applicable nonalienation language as

incorporated into the 2004 Amendment states the following:

> Non-alienation.  The Representative's interests under this Agreement are
> not subject to the claims of the Representative's creditors and may not
> otherwise be voluntarily or involuntarily assigned, alienated or encumbered.

> Ex. I, ¶7, *First Amendment to Sales Representative Agreement,* dated
> August 12, 2004, incorporating by reference Ex. H, ¶XII(2) 2001, *Sales
> Representative Agreement*, dated June 5, 2001.

Apparently this language was first inserted in the 1998 Sales Representative

Agreement at the recommendation of Inland Steel and carried throughout up to and including the

2004 Amendment where the 2001 Sales Representative Agreement was incorporated by reference.

All Parties agree that the particular language is "not normal" and "unusual."  In the context of its

use, the Court finds it somewhat odd as well.  Sandy Eynon found the circumstances surrounding

its inclusion difficult to explain.  He did not say it was inserted for purposes of creating an express

trust. The only explanation Sandy Eynon could offer for its use was that the language was

"recommended" by Inland Steel to protect his interests so that third parties could not encumber the

commission payments due Eynon.

Other than Sandy Eynon's belief as to the purpose for its inclusion there is no

indication in the record as to what Inland Steel actually intended at the time of the 1998 contract

when the language was first inserted or the intent of the Parties when it was to be inserted at the time

of the contract renegotiation in 2001.  Whatever actually was intended by its inclusion, under the

circumstances and in context, this Court does not believe it was intended to create an express trust.

Both Parties were represented by counsel each time the language was made part of the respective

agreement.  Although the clause possesses the characteristics of a spendthrift trust provision for

purposes of estate law, it is difficult to imagine that here an express trust would be intended without

more.

        The clause provides that the Representative's interests under the Agreement are not

subject to the claims of the *Representative's* creditors but does not appear to provide a similar,

purported insulation from *Brockway's* creditors, such as LaSalle Bank.  The final phrase, i.e., "may

not otherwise be voluntarily or involuntarily assigned, alienated or encumbered," is similarly

opaque.  Sandy Eynon's attempt at explanation provides little help in divining the reason for its

inclusion.  According to his understanding, the provision was designed to protect "anyone laying

claim to any of my receivables.  My percentage of sales commissions."  *Trial Transcript*, May 30,

2006, Document No. 65, p. 80, l. 3-6.  On its face, the language may protect *Eynon's* receivables

(not Eynon's share of *Brockway's* receivables) from Eynon's creditors but no more.

        In addition, the nonalienation language is somewhat inconsistent with Section IX of

the 2001 Sales Representative Agreement (incorporated by reference into the 2004 Amendment),

titled "Assignment" which specifically allows Brockway to assign the Agreement to a parent or

subsidiary, or a merger partner or asset buyer.  In any event, based upon the record before the Court,

Eynon has failed in its burden to show that this provision was designed and included with an intent

by Brockway or Inland Steel to establish an express trust.  If such were the case it is reasonable to believe that, under the circumstances in which the contract was negotiated, if a trust was actually intended and there was a meeting of the minds between Brockway and Eynon in that regard, it would have been done by including appropriate language specifying a trustee, a trust res and specific duties concerning that trust res.

The more plausible explanation given by the Parties as to the purpose and effect of the nonalienation language is that it was designed to protect Eynon by insulating Eynon against creditors who attempted to garnish monies paid to it by Brockway.  Fortunately, in light of the issues currently before it, the Court need not determine the effectiveness of such a provision in the context of the various sales representative agreements.  But in light of Sandy Eynon's explanation as to its intended purpose and in an attempt to give effect to the nonalienation language in the context it was used in the various agreements, this is a reasonable interpretation.

Eynon's burden here is to show the existence of an express trust by clear, convincing and precise evidence.  To that end, the nonalienation language is anything but clear, convincing or precise.  Even coupled with Eynon's analysis of other parts of the various sales representative agreements, which may shed some further light on the Parties' intended use of the nonalienation language, a final interpretation of it for purposes of establishing the existence of an express trust remains vague.  As Eynon admits, the nonalienation language was just "one part or example" of the alleged trust relationship between Eynon and Brockway.  When cast against the testimony of Sandy Eynon, its probative effect becomes doubtful.

29

Based on the evidence before it, this Court finds that Eynon has failed to sustain its admitted burden of showing the Parties' manifestation of intent to create an express trust and therefore the existence of an express trust, by clear, precise and unambiguous evidence.[15] *Keller v. Keller*, 41 A.2d 547, 549 (Pa. 1945); *In re Manzo*, 106 B.R. 69, 71 (Bankr. E.D. Pa. 1989); *In re Borbidge*, 90 B.R. 728, 734 (Bankr. E.D. Pa. 1988).    The repayment language contained in Paragraph 4 of the 2004 Amendment does not change the Court's opinion in this regard.    The language is not helpful to Eynon since it appears as if an interest component is actually made part of the terms.    Likewise, the nonalienation language is of no help to Eynon's cause.    It is not probative to the issue of intent to create an express trust.    By its very terms and placement in the various agreements it remains unclear and ambiguous as to its intended effect, and on balance, does not support Eynon's claim to an express trust.    The above findings became even more apparent when considered in light of the testimony of Sandy Eynon which indicates that there never was a true intent to create an express, legally enforceable trust between the Parties.    As such, Eynon's claim as to the existence of an express trust must be denied.

Even assuming evidence existed which supported a finding of an intent to create an express trust, based on the record before it, this Court is unable to find any evidence of an ascertainable res, an independent requirement for an express trust under applicable Pennsylvania law.    Granted, all the written documents required Brockway to pay Eynon a percentage sales

---

[15]    As noted, Eynon also seems to claim the existence of an express trust simply by virtue of the Parties occupying some confidential or fiduciary relationship. 1 *P.L.E. Trust §33* (2d Ed. 2005) (incorrectly referred to by Eynon as *"51" P.L.E. Trust*, §33).  Other than this secondary source and the *Williams* case, Eynon cited no other legal support for the proposition that, standing alone, a confidential relationship supports the finding of an express trust.  Earlier in this Opinion, the Court identified the elements required for an express trust under Pennsylvania law, none of which recognizes "express trust by confidential relationship."  This is consistent with our review of the case law cited by *1 P.L.E. Trust §33*, in support of the alleged concept.  The reported cases actually involve constructive trusts not express trusts.

commission based on the net amount collected on invoices submitted by a customer for products

sold and delivered.  In and of itself, this language does not create a res but simply provides the

mathematical means for determining the amount of a debt.  This interpretation is further supported

by the Parties' subsequent actions.  At no time prior to the petition date was there a separate bank

account (including any deposit, checking or other account) established or used by the Debtor solely

for the deposit of net collected receivables allegedly due Eynon.  Moreover, according to the

testimony of Sandy Eynon, Brockway was never required by Eynon to set aside and a percentage

of the net receivables for Eynon's benefit.  Rather, Brockway was permitted to use the money in any

manner it desired until Eynon's commission payments became due.

Undaunted, Eynon claims that the Eynon Escrows established pursuant to the Interim

DIP Order and Final DIP Order created the required res to satisfy this element of an express trust

under Pennsylvania law.  As previously noted, these escrows were designed solely to create a

mechanism for payment in the event Eynon was otherwise successful in its claim of entitlement

based on its trust theories.  The escrows were created to maintain the status quo without modifying

any of the Parties' rights.  At no time was it intended by the Parties, or the Court for that matter, that

under the circumstances of their origin the creation of the Eynon Escrows would be tantamount to

satisfying an element of Eynon's express trust theory which was Eynon's sole burden to prove.[16]

To sanction Eynon's use of the escrows for purposes of sustaining its burden in this regard, to the

prejudice of Brockway and LaSalle Bank, was not the intended effect of either the Interim DIP

Order and Final DIP Order.

---

[16]     *See n. 5, supra.*

31

In a further attempt to ascertain the existence of a res for purposes of satisfying this element of an express trust, alternatively, Eynon directs the Court's attention to the holding of *In re Edison Brothers, Inc.,* 243 B.R. 231 (Bankr. D. Del. 2000).  *Edison Brothers* would require the application of federal common law, rather than Pennsylvania law, in determining whether a trust exists in all circumstances.  In deciding on motions for summary judgment whether the proceeds held by the debtor from liquidation of an employee pension plan which took place in a prior Chapter 11 comprised a constructive trust, the court in *Edison Brothers* held that the Third Circuit's decision in *Columbia Gas* required application of federal common law in all instances involving the application of *Section 541(d)* of the Bankruptcy Code.  As a result, Eynon contends that for purposes of ascertaining the existence of a res in this case the Court should apply the tracing rules required by federal common law rather than Pennsylvania law.

*Columbia Gas* applied federal common law in imposing a constructive trust on refunds held by the Debtor who, together with affiliates, operated one of the largest natural gas systems in the country.  As such, the debtor's operations were extensively regulated by the Federal Energy Regulatory Commission (FERC) pursuant to the Natural Gas Act (NGA), *15 U.S.C. §§717-717(w)* (1988 & supp III 1991).  Among other things, FERC was responsible for assuring that rates among gas companies were fair and reasonable.  It was in this setting the Third Circuit reiterated that while it was "axiomatic" for federal law to govern "questions involving the interpretation of a federal statute," when applying federal law, courts remained free to "either fashion a uniform federal common law rule or adopt state law as the federal rule of decision."  *In re Columbia Gas Systems*, 997 F.2d at 1055.  Under the facts before it in *Columbia Gas*, the Third Circuit decided it was more appropriate to apply federal common law in determining the existence of a constructive trust noting

32

that developing a federal common law rule was the exception rather than the rule. "Federal law should coincide with the relevant state law unless state law would undermine the objectives of the federal statutory scheme and there is a distinct need for nationwide legal standards." *Id.* at 1055 (citing *United States v. Kimball Foods, Inc.*, 99 S.Ct. 1448, 1458 (1979)). Nevertheless, under the facts before it and review of applicable policy considerations, the Third Circuit felt compelled to apply federal common law. The customer refunds held by the debtor in *Columbia Gas* were held as a result of a statutory trust created by federal law and therefore were required to be excluded as property of the estate since important federal interests were implicated.

In *Columbia Gas* the Third Circuit applied federal common law to allow for a more expansive definition of a constructive trust not typically found in applicable state law, that is, imposing a trust "when an entity acts as a conduit collecting money from one source and forwarding it to its intended recipient." *Id.* at 1056. The Third Circuit reasoned that this result was mandated as a matter of policy. First, a national uniform law was needed so as to eliminate the vagaries of any state trust law applying a requirement of "wrongdoing" before a trust was found to exist. Second, applying state law to determine property rights would frustrate NGA's central purpose to provide natural gas to the public at reasonable rates. Third, federal common law would not upset "commercial expectations" that federal law, not state law, would apply to federally created property rights.

As an aside while discussing the second policy consideration, the Third Circuit noted that the legislative history behind the enactment of *Section 541(d)* indicated that it was Congress's intent that when a "debtor collects money on behalf of another, this money is held in constructive

trust for the intended eventual recipient even absent any misconduct." *Id.* at 1056. It is based on this comment that the court in *Edison Brothers* felt compelled to apply federal common law in all situations involving *Section 541(d)*. We do not believe this comment was central to the Third Circuit's ruling in *Columbia Gas*. Rather, we believe the better approach is to narrowly interpret *Columbia Gas* in light of its facts. *Accord In re Sacred Heart Hospital of Norristown*, 175 B.R. 543, 559 (Bankr. E.D. Pa. 1994).

In *Columbia Gas*, the Third Circuit sought to carve out a practical exception consistent with the requirements of *Kimball,* to the application of state law under the circumstances, simply holding that when a court construes a federally created statutory property right, federal common law applies. Moreover, giving the *Columbia Gas* decision this more narrow effect is consistent with the holdings in *Goldberg v. New Jersey Lawyers' Fund*, 932 F.2d 273 (3d Cir. 1992) and *City of Farrell v. Sharon Steel Corporation*, 41 F.3d 92 (3d Cir. 1994). In these cases, which both preceded and followed *Columbia Gas*, the Third Circuit directed that the reviewing court must first look to state law to determine whether the claimant has shown the existence of a trust relationship and independent property right. Thereafter, once the constructive trust is identified courts are to look to federal law to determine whether the claimant has appropriately traced and identified the trust funds. *City of Farrell*, 41 F.3d at 95; *Goldberg*, 932 F.2d at 280. Use of this more narrow approach to *Columbia Gas* is also consistent with the requirement in the Third Circuit (and others) that in the first instance, for purposes of determining whether property held by the debtor is property of the estate under *Section 541*, the reviewing court is required to use state law to determine whether a property right exists. *See In re Nejberger*, 934 F.2d 1300, 1302 (3d Cir. 1992); *In re Kamand Construction, Inc.,* 298 B.R. 251 (Bankr. M.D. Pa. 2003).

34

Furthermore, in this case, there are no federally created statutory property rights at issue. As such, the policy analysis given in *Columbia Gas* for applying the federal common law simply does not exist. Here there is no need for a uniform national law. Since no regulatory scheme or program is at issue, looking to state law to determine the nature of any property rights does not frustrate or undermine any uniquely federal program. Finally, because the Parties specifically agreed to be bound by Pennsylvania law in construing the various sales representative agreements the commercial expectations of the Parties are not upset.

Since the *Columbia Gas* case bankruptcy courts often interpret various sections of the Bankruptcy Code by reviewing the applicable state law of trusts. For example, the Pennsylvania law of trusts is used when analyzing *Section 541(c)(2)* for purposes of determining whether retirement funds held by the debtor are property of the estate. *See In re Heny*, 316 B.R. 827 (Bankr. E.D. Pa. 2004); *In re Fulton*, 240 B.R. 854 (Bankr. W.D. Pa. 1999). In determining whether the dischargeability provisions of *Section 523(a)(4)* apply these courts refer to Pennsylvania trust law. *See In re Verrone*, 277 B.R. 66 (Bankr. W.D. Pa. 2002); *In re McCormick*, 283 B.R. 680 (Bankr. W.D. Pa. 2002); *In re Hartman*, 254 B.R. 669 (Bankr. E.D. Pa. 2000). Likewise, our research reveals that since *Columbia Gas* bankruptcy courts routinely follow a similar practice when interpreting *Section 541(d)* and apply Pennsylvania trust law to initially determine the existence of a trust be it express or constructive. *See In re Kamand Construction, Inc.*, 298 B.R. 251 (Bankr. M.D. Pa. 2003); *In re Forman Enterprises, Inc.*, 281 B.R. 600 (Bankr. W.D. Pa. 2002); *In re Erie Marine Enterprises, Inc.*, 216 B.R. 529 (Bankr. W.D. Pa. 1998); *In re Shareholders Funding, Inc.*, 188 B.R. 150 (Bankr. E.D. Pa. 1995); *In re Globe Store Acquisition Co., Inc.*, 178 B.R. 400 (Bankr.

M.D. Pa. 1995); *In re Sacred Heart Hospital of Norristown*, 175 B.R. 543 (Bankr. E.D. Pa. 1994);

*In re Joseph B. Dahlkemper Co., Inc.*, 165 B.R. 149 (Bankr. W.D. Pa. 1994); *accord In re Bake-Line*

*Group, LLC*, 2007 WL 329695, *2 (Bankr. D. Del. Feb. 5, 2007) (Illinois state law applied in

determining the existence of constructive trust pursuant to *Section 541(d)*).

       Eynon seeks to apply *Edison Brothers* to the facts of this case in order to skirt the

requirements of Pennsylvania law requiring in the first instance, that a specified trust res be

established when determining the existence of an express trust. *Edison Brothers* identified by way

of dicta that a means existed other than by use of the "lowest intermediate balance test" to trace the

existence of a res. *In re Edison Brothers*, 243 B.R. at 239-240. So long as the required nexus was

shown, federal law is satisfied and the constructive trust is enforceable. *City of Farrell*, 41 F.3d at

102. While denying summary judgement for, among other reasons, the failure to show the required

nexus between the constructive trust at issue and the funds in the debtor's possession, the court in

*Edison Brothers* suggested another possible manner in which to demonstrate a nexus in addition to

use of the "lowest intermediate balance test." Notwithstanding the sweep of all funds into a

concentration account and the application of those funds to a revolving line of credit, if at the time

of filing there remained availability under the revolver to allow the debtor to accommodate payment

to the beneficiary of the constructive trust, the required nexus under federal common law *may* exist

to establish an enforceable constructive trust. *In re Edison Brothers*, 243 B.R. at 239-40.

       Eynon claimed that the receivables Brockway received enabled it to fund operations

in an amount sufficient to pay Eynon's claim once LaSalle Bank exercised its rights with Brockway

under its financing documents and took control of the receivables. Therefore, according to Eynon,

*Edison Brothers* supports the notion that Eynon has demonstrated the appropriate connection, or

nexus, to the res.  Although this argument may have some appeal if it were ultimately determined

that a constructive trust existed in favor of Eynon, for the reasons stated, *Edison Brothers* and the

suggestions contained in it, have no bearing on the Court's determination as to whether an express

trust exists under Pennsylvania law.

Having determined that, based on the evidence presented, no express trust existed for

its benefit, Eynon may nevertheless prevail if it can demonstrate the existence of a constructive trust

under the facts of this case.

*Constructive Trust*

In its *Counterclaim* Eynon alleged the existence of a constructive trust in its favor

since receivables from Brockway's sales originated solely a result of the product development and

sales engineering services that Eynon provided to Brockway.  Eynon claimed that under the terms

of the various sales representative agreements and the Parties' conduct in implementing them over

the course of time, a fiduciary/trust relationship was created.  Therefore, according to Eynon,

Brockway was, and continued to be, subject to an equitable duty to convey to Eynon the sales

commissions arising from both prepetition and postpetition receivables.  Otherwise, according to

Eynon, Brockway and LaSalle would be unjustly enriched to Eynon's detriment.  As such, Eynon

claims that the net collected receivables are subject to a constructive trust.

The propriety for imposition of a constructive trust is governed in the first instance,

by applicable state law which, as previously noted, is the law of Pennsylvania.  *City of Farrell*, 41

37

F.3d 95; *Goldberg*, 932 F.2d 280.  Under both Pennsylvania and federal law, a constructive trust is

not a real trust but rather an equitable remedy utilized to avoid unjust enrichment.  *In re Columbia*

*Gas Systems*, 997 F.2d at 1059; *In re Tri-State Mechanical Services, Inc.*, 141 B.R. 488 (Bankr.

W.D. Pa. 1992); *In re Joseph B. Dahlkemper Co., Inc.*, 165 B.R. 149, 154 (Bankr. W.D. Pa. 1994)

(citing *Stauffer v. Stauffer*, 351 A.2d 236, 241 (1976)).

The Pennsylvania Supreme Court has stated "[a] constructive trust arises where a

person who holds title to property is subject to an equitable duty to convey it to another on the

ground that he would be unjustly enriched if he were permitted to retain it." *Buchanan v. Brentwood*

*Federal Savings and Loan Ass'n*, 320 A.2d 117, 126; *Yohe v. Yohe*, 353 A.2d 417, 421 (Pa. 1976);

*Nagle v. Nagle*, 799 A.2d 812, 819 (Pa. Super. Ct. 2002)*; see also In re Kamand Construction, Inc.*,

298 B.R. at 255; *In re Forman Enterprises, Inc.*, 281 B.R. at 610.  A constructive trust is actually

a form of restitution and an equitable remedy imposed to avoid unjust enrichment.  Specific intent

to create a constructive trust is not required.  *Roberson v. Davis,* 580 A.2d 39, 41 (Pa. Super. Ct.

1990); *In re Kaman Construction, Inc.*, 298 B.R. 254-255 (Bankr. M.D. Pa. 2003); *In re Joseph B.*

*Dahlkemper Company, Inc.*, 165 B.R. 149, 154 (Bankr. W.D. Pa. 1994) (citing *Stauffer v. Stauffer*,

351 A.2d 236, 241 (1996)).

An equitable duty to convey the property arises only in the presence of fraud, duress,

undue influence, mistake or as is alleged here, abuse of a confidential relationship.  *Yohe,* 352 A.2d

at 421; *see also In re Kamand Construction*, 298 B.R. at 255; *In re Shareholders Funding, Inc.*, 188

B.R. 150, 156 (Bankr. E.D. Pa. 1995); *In re Kulzer Roofing, Inc.*, 139 B.R. 132 (Bankr. W.D. Pa.

1992) (and cases cited therein).  As with proof of the existence of a constructive trust, the burden

38

of proof on the issue of whether a constructive trust should be imposed is a matter of state, not federal law. *In re H. King & Associates*, 295 B.R. 246 (Bankr. N.D. Ill. 2003); *Russell*, *Bankruptcy Evidence Manual*, 2007 Ed., §301.66, p. 936-937.  A heavy burden lies with one who seeks to have a constructive trust imposed.  The evidence must be clear, direct, precise and convincing. *Roberson v. Davis,* 580 A.2d 39, 41 (Pa. Super. Ct. 1990)*; Masgai v. Masgai*, 333 A.2d 861, 865 (Pa. 1975); *In re Kamand Construction, Inc.*, 298 B.R. 251, 256 (Bankr. M.D. Pa. 2003); *In re Sacred Heart Hospital of Norristown*, 175 B.R. 555 (Bankr. E.D. Pa. 1994); *In re I.D. Craig Service Corporation*, 125 B.R. 453, 456 (Bankr. W.D. Pa. 1991).

There are no rigid standards for the imposition of a constructive trust.  Because constructive trusts find their root in equity, courts impose them where there is a finding that a party, against whom the trust is imposed, acquires property in a manner which creates an equitable duty in favor of the party seeking the constructive trust.  Traditionally, constructive trusts have been imposed where a party acquires legal title to property by violating some express or implied duty owed to another.  Such a trust may also be imposed where property is obtained through bad faith, fraud, or lack of good conscience. *In re Kulzer Roofing, Inc.*, 139 B.R. at 141.

In alleging the existence of a confidential relationship, Eynon harkens back to the *Williams* case, which according to Eynon, is support for establishing a "confidential relationship" between Eynon and Brockway, a finding necessary to meet the threshold element for a constructive trust. *Yohe,* 352 A.2d at 420-421; *In re Kamand Construction*, 298 B.R. at 255.  As previously noted, *Williams* does support a finding that the principal/agent relationship between Eynon and Brockway rose to the level of a "fiduciary relationship" because of the trust and confidence Eynon

placed in Brockway to exercise good faith and candor in identifying and providing Eynon the appropriate information necessary to calculate the sales commission due it. But Eynon seeks more than an accounting as the object of this fiduciary relationship. Eynon first claims that because of this fiduciary relationship *Williams* requires the relationship to also be considered a "confidential relationship." Next, Eynon claims this confidential relationship was abused by Brockway because of its failure to pay Eynon the earned commissions due it. As a result, Eynon claims it is entitled to payment of all of its accrued, unpaid, earned commissions.

Assuming a confidential relationship exists between Eynon and Brockway, it would appear the object of the confidential relationship was to provide an accounting not set aside monies so as to assure payment of Eynon's earned commissions. Any "abuse" of the confidential relationship created through application of the *Williams* standard would appear to be a failure to render an accounting rather than failure to make payment. Whether or not a confidential relationship existed need not be determined. Even assuming all the foregoing was true, Eynon has failed to otherwise meet its burden of proof for the imposition of a constructive trust requiring payment to it of the Eynon Escrows.

Imposing a constructive trust is the mechanism by which equity remedies situations where property is acquired under circumstances such that the holder of the legal title may not in good conscience retain the beneficial interest to the subject property. Equity reverts the holder of the legal title into a trustee. The key consideration in determining whether to impose a constructive trust is, if in doing so, it would avoid or prevent unjust enrichment. *Yohe*, 353 A.2d at 420-421; *Buchanan,* 320 A.2d at 126; *Nagle*, 799 A.2d at 819; *In re Erie Marine Enterprises, Inc.*, 216 B.R.

529, 534 (Bankr. W.D. Pa. 1998) (citations omitted); *Joseph B. Dahlkemper Co.*, 165 B.R. at 154;

*In re Kulzer Roofing*, 139 B.R. at 141 (quoting *Pierro v. Pierro*, 264 A.2d 692, 696 (1970)).

Eynon's only argument supporting its claim of unjust enrichment is that under the circumstances it

would be inequitable for LaSalle Bank to keep the funds represented by Brockway's receivables

which are subject to LaSalle Bank's undisputed, priority secured interest and used to pay down the

outstanding obligation on the LaSalle loan.

There is no dispute that since 1998 LaSalle Bank infused substantial cash into

Brockway's operation.  During the relevant time period, beginning in July 2004 and continuing

through the petition date, on a daily basis Brockway's receivables were collected and deposited into

accounts controlled by LaSalle Bank and applied to the LaSalle Bank obligation.  These payments

would then result in the daily availability of new monies to fund advances on Brockway's revolving

loan in order to pay ongoing operational costs and expenses. *Stipulations of Fact and Evidence for

Purposes of Trial*, Document No. 63, ¶65.  It is undisputed that Brockway owed substantial sums

to LaSalle Bank.  The amounts collected by LaSalle Bank were significantly less than the amount

LaSalle Bank had infused over time into Brockway's operations.  At the time of trial the Parties

stipulated that the amount owed LaSalle Bank was "greater than $500,000." *Trial Transcript*, May

30, 2006, Document No. 65, p. 23-24, l. 24-1.  Nor did LaSalle Bank collect amounts beyond what

it was owed.

These facts do not demonstrate that either Brockway or LaSalle Bank was unjustly

enriched by the collection of the receivables and use of them to pay off Brockway's outstanding

indebtedness.  There is nothing in the record before the Court indicating that it would *not* be in

"good conscience" to allow LaSalle Bank to retain the monies to which it was entitled under its financing documents. There is nothing in the record to indicate that Brockway or LaSalle Bank abused any confidential relationship by allowing the receivables to pay down the indebtedness thereby obtaining in excess of what it was owed. As such, the Court finds no proof of any unjust enrichment to the detriment of Eynon benefitting Brockway or LaSalle Bank.[17] *Accord Erie Marine Enterprises,* 216 at 529.

Eynon's sole allegation of unjust enrichment is that Brockway and LaSalle Bank would be "unjustly enriched" if permitted to retain 100% of the receivables Brockway collected and used to pay the LaSalle Bank obligation since a portion of those receivables represented Eynon's sales commission, without whose effort the receivables would not exist. As the court in *Kamand Construction* cogently observed, this argument "is appealing in its simplicity, but it ignores the fact that this kind of unjust enrichment occurs in almost any bankruptcy ...." *In re Kamand Construction, Inc.*, 298 B.R. at 257.

Although *Kamand Construction* involved a construction industry debtor accepting deposits for future work who used those funds to pay for materials to complete current jobs depriving the creditor of funds previously deposited for another project, the observation is relevant to the current case involving a commission sales representative whose commissions remained unpaid as of the time of petition filing. This type of situation is the norm and often arises in a bankruptcy setting. Recognizing the possibility of this situation arising, the Bankruptcy Code simply treats the

---

[17]    Nor was Brockway simply a conduit obligated to pass the monies it received through to Eynon on behalf of Brockway's customers. Eynon performed services for the benefit of Brockway by marketing, promoting and soliciting orders for Brockway's products. In exchange for the services provided, Brockway and Eynon agreed that Eynon would be compensated for its services by receiving a stated percent of the "net amount collected on invoices."

funds in Brockway's possession and therefore paid to LaSalle Bank as property of the estate, carving

out a nondichargeability exception in certain circumstances. *Id.* at 257. This somber concept of

bankruptcy reality was also acknowledged by the court in *In re Globe Store Acquisition Co., Inc.*

which noted:[18]

> "While we are mindful that an entity which receives something for no
> consideration, and not as a gift, is unjustly enriched, we are compelled to
> observe that if that were the only standard, then every creditor in every
> bankruptcy case could claim to be the beneficiary of a constructive trust and
> therefore not subject to the distribution schedules outlined by the
> Bankruptcy Code."
>
> *In re Globe Store Acquisition Co., Inc.*, 178 B.R. 400, 404 (Bankr. M.D. Pa.
> 1995).

A constructive trust is an equitable remedy designed to prevent unjust enrichment. The mere failure

of a debtor in a Chapter 11 proceeding to pay its debts cannot provide the equitable basis for the

imposition of a constructive trust. To impose a constructive trust simply under such circumstances,

without more, would allow creditors to obtain preferential treatment in bankruptcy.[19]

    In light of the foregoing, regardless of whether Eynon has demonstrated the existence

of a confidential relationship, it has failed to provide clear, direct, precise and convincing evidence

that either Brockway or LaSalle Bank have been unjustly enriched as a result of the use of the

---

[18]    Other court echo similar sentiments. *See In re Shareholders Funding, Inc.*, 188 B.R. 150, 158 (Bankr. E.D. Pa. 1995); *In re Sacred Heart Hospital of Norristown*, 175 B.R. 543, 556 (Bankr. E.D. Pa. 1994) (without such an equitable predicate every debtor in bankruptcy would be "unjustly enriched" and every unsecured creditor entitled to a constructive trust).

[19]    Bankruptcy courts generally are not inclined to utilize a trust theory as a means of obtaining preferential treatment in a bankruptcy. Certain decisions have viewed with disfavor creditors claiming they are, in reality, a beneficiary of a trust created by the debtor on the creditor's behalf. Such claims are allowed to prevail in only the narrowest of circumstances as an exception to the "equality of distribution" rule. *In re Sacred Heart Hospital of Norristown*, 175 B.R. 543 (Bankr. E.D. Pa. 1994); *In re Kulzer Roofing, Inc.*, 139 B.R. 132, 139 (Bankr. E.D. Pa. 1992); *see also In re Temp-Way Corp.*, 82 B.R. 747, 753 (Bankr. E.D. Pa. 1988).

receivables under the facts of this case.  A court "[s]hould not convert absolute ownership into an estate of lesser quality" unless evidence in support of a constructive trust "is of the highest probative value." *In re Forman Enterprises, Inc.*, 281 B.R. 600, 610-611 (Bankr. W.D. Pa. 2002) (quoting *Masgai v. Masgai*, 333 A.2d 861, 865 (Pa. 1975)). As such, Eynon's demand for imposition of a constructive trust on the receivables collected by Brockway and paid to LaSalle Bank must be denied.

Because we have determined that Eynon has failed to demonstrate any unjust enrichment in favor of Brockway or LaSalle Bank there is no need to identify the res of the alleged constructive trust or trace the commingled trust funds.

### *CONCLUSION*

Eynon has failed to sustain its acknowledged burden by proving each of the elements of the alleged express trust by clear, precise and unambiguous evidence.  Specifically, Eynon failed to meet its required burden of proof by demonstrating the necessary intent to create a legally enforceable express trust.  The testimony of Sandy Eynon negates the intention to create an express trust.  His testimony indicates that the trust relationship between Brockway and Eynon was simply one grounded on a mutual feeling of trust in a moral sense.  The payment and nonalienation language contained in the relevant sales representative agreements are not probative of an intent to create an express trust.  Nor has Eynon met its independent burden in ascertaining the existence of any res related to the alleged express trust.  Furthermore, Eynon also failed to meet its burden of proof in demonstrating the existence of a constructive trust.  While a confidential relationship may

have existed between Eynon and Brockway, Eynon failed to show by clear, direct, precise and convincing evidence that Brockway and/or LaSalle Bank would be unjustly enriched if either were allowed to retain the receivables in question without first satisfying Eynon's claim for unpaid, earned sales commission.    The funds represented by the Eynon Escrows are the property of Brockway and LaSalle, as their interests appear, and accordingly, payment shall be made to them. For similar reasons, the pending, related *Motion for Relief from Automatic Stay* filed by Eynon shall be dismissed with prejudice.

Appropriate orders will be entered.[20]

Dated: March 30, 2007

_____
Thomas P.  Agresti
United States Bankruptcy Judge

Case Administrator to serve:
Debtor
Robert D. Nachman, Esq., Lead Counsel for LaSalle Bank National Association
Beverly Weiss Manne, Esq., for LaSalle Bank National Association
Ronald L. Hicks, Jr., Esq., for Eynon Associates, Inc.
Daniel A. Zazove, Esq., for the Debtor
Guy C. Fustine, Esq., for The Committee of Unsecured Creditors

---

[20]    This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| BROCKWAY PRESSED METALS, INC., | : | Case No. 05-11891-TPA |
| Debtor, | : | Chapter 11 |

| | | |
|---|---|---|
| BROCKWAY PRESSED METALS, INC., | : | |
| LASALLE BANK NATIONAL | : | |
| ASSOCIATION, GENERAL MOTORS | : | |
| CORPORATION, BORGWARNER | : | |
| TORQTRANSFER SYSTEM, INC., | : | |
| AVM, INC., and DELPHI CORPORATION,: | | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Adversary No. 05-1303-TPA |
| | : | |
| EYNON ASSOCIATES, INC., | : | |
| Defendant | : | |

## JUDGMENT ORDER

AND NOW, this *30th* day of *March, 2007*, following trial, briefs and arguments of the Parties concerning the Plaintiffs' *First Amended Complaint to Determine Validity, Priority and Extent of Liens under 11 U.S.C. §506, Objecting to Claim under 11 U.S.C. §502, and to Avoid Preferences Under 11 U.S.C. §547 and §550*, and Defendant's *Counterclaim,* for the reasons set forth in the *Memorandum Opinion* filed this date in the above matter, the content of which is incorporated herein, pursuant to *Fed. R. Bankr. P. 7052* and *9021,*

It is hereby *ORDERED, ADJUDGED and DECREED* that the relief requested by the Plaintiffs, *Brockway Pressed Metals, Inc.* and *LaSalle Bank National Association* in Counts II and V of said Complaint is *GRANTED* and judgment entered in their favor.

1

It is ***FURTHER ORDERED*** that the relief requested by Defendant *Eynon Associates, Inc.* in its *Counterclaim* is ***DENIED*** and the same is ***DISMISSED*** with prejudice.  The claim of the Defendant is deemed a general, unsecured claim for purposes of this bankruptcy.

It is ***FURTHER ORDERED*** that the $491,293.16, plus all accrued interest, held in the "Garnishment Escrow" and representing the current balance of the "Eynon Escrows" is to be immediately paid to said Plaintiffs and retained as their respective interests appear.  To the extent any additional funds remain from the Eynon Escrows after payment of the foregoing, said funds shall be retained by the Debtor, *Brockway Pressed Metals, Inc.* for distribution consistent with the system of priority set forth in the Bankruptcy Code or as otherwise directed by Order of this Court.

Thomas P. Agresti
U.S. Bankruptcy Judge

2